UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ALLAGAS, ARTHUR RAY, BRETT MOHRMAN, and BRIAN DICKSON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BP SOLAR INTERNATIONAL, INC., HOME DEPOT U.S.A., INC. and DOES 1-10, inclusive, | Case No. 3:14-cv-00560-SI<br><br>**CONDITIONAL FOURTH AMENDED COMPLAINT FOR DAMAGES AND INJUNCTION**<br><br>**CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

Plaintiffs MICHAEL ALLAGAS, ARTHUR RAY, BRETT MOHRMAN, and BRIAN

DICKSON ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege as

follows:

## I.   **INTRODUCTION**

1.      This case arises out of the manufacture and sale of photovoltaic modules

manufactured by Defendant BP Solar International, Inc. ("Defendant" or "BP") from 1999 to

2007 in which 12-gauge connecting cables, with or without flat spade terminals, are soldered

directly to module bus ribbons using a module backsheet burn-through process, including but not

limited to (1) any modules equipped with S-type or S-W type junction boxes, and (2) any

modules equipped with junction boxes or related components depicted in the BP drawings listed

in Exhibit A ("Solar Panels" or "Class Panels"). On information and belief, and subject to

modification as discovery proceeds, the term "Solar Panels" or "Class Panels" includes but is not

limited to the model numbers listed in Exhibit A.

2.      A defect in a component of the Solar Panels – known as the junction box – causes

the Solar Panels to fail, resulting in a loss of electric current and serious safety risks, including the

risk of fire. The Solar Panels cannot be repaired; they must be removed and replaced.

1

3.      BP has been aware of the defects alleged herein since at least 2003 but continued selling the Solar Panels until 2010.

4.      Plaintiffs seek recovery on behalf of themselves and all United States residents who purchased the Solar Panels or purchased properties on which the Solar Panels were installed (the "Class") for breach of express and implied warranties and for violation of the provisions of the California consumer protection and unfair business practice statutes.

## II.   PARTIES AND VENUE

5.      Plaintiff Michael Allagas ("Allagas") is a resident of San Bernardino, California. On December 23, 2005, Allagas purchased a BP Solar Home Solution® from Home Depot which included twenty-four (24) BP 4175B Solar Panels.

6.      Plaintiff Arthur Ray ("Ray") is a resident of Brentwood, California. On August 31, 2005, Ray purchased eighteen (18) BP SX 170B Solar Panels for installation at his home.

7.      Plaintiff Brett Mohrman ("Mohrman") is a resident of Danville, California. In June 2012, Mohrman purchased a home on which twenty (20) BP 2150S Solar Panels were installed.

8.      Plaintiff Brian Dickson ("Dickson") is a resident of Oakdale, California. Dickson owns a home on which twenty-eight (28) BP 4170S Solar Panels were installed.

9.      BP is a Delaware corporation with its principal place of business in Houston, Texas. Plaintiffs are informed and believe and thereon allege that BP is the successor by merger to BP Solar International LLC. All references to BP herein refer to BP Solar International LLC or BP Solar International, Inc. as the context requires.

10.     Between 2008 and 2011, BP had its principal place of business in San Francisco, California. BP shut down production of the Solar Panels in 2010 and ceased to do business – except for the processing of claims related to the Solar Panels – in 2011.

11.     Home Depot U.S.A., Inc. ("Home Depot"), is a Delaware corporation with its principal place of business in Atlanta, Georgia.

12.     Plaintiffs are unaware of the true names and capacities of the Defendants sued herein as DOES 1 through 10, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when they are

2

ascertained. Plaintiffs are informed and believe that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged and that the damages suffered by Plaintiffs and the Class, were proximately caused by their conduct.

13.     Plaintiffs are informed and believe that all Defendants, including the fictitious Doe Defendants 1 through 10, were at all relevant times acting as actual or ostensible agents, conspirators, partners, joint venturers or employees of all other Defendants and that all acts alleged herein occurred within the course and scope of that agency, employment, partnership, or enterprise, and with the express or implied permission, knowledge, consent, authorization and ratification of their co-Defendants.

14.     Venue in this County is proper under California Code of Civil Procedure § 395 because, *inter alia*: (1) Defendants BP and Home Depot are foreign corporations which have no designated principal place of business in California; (2) Defendant BP contracted to perform the obligations to Plaintiffs Ray and Mohrman and a substantial portion of its obligations to the proposed Class in this County; and (3) Defendant Home Depot contracted to perform substantial obligations to members of the Class in this County.

15.     Venue in this County is proper under Civil Code § 1780(d) because it is where the transactions related to Plaintiffs Ray and Mohrman and a substantial portion of the transactions between BP and the Class occurred. Attached hereto as **Exhibits B and C**, respectively, are the declarations of Ray and Mohrman establishing this Court as the proper venue for this action.

## III. <u>FACTUAL ALLEGATIONS</u>

### A.     <u>The Latent Defect in the Solar Panels and its Effects</u>

16.     Solar Panels are installed on racks which are mounted on the roof or – occasionally – on the ground.

17.     The Solar Panels are connected together by electric cables ("connecting cables") to achieve a desired output voltage. The failure of a single Solar Panel will cause the panels connected to it to stop functioning, resulting in a substantial reduction of the capacity of the Solar Panels to produce electricity.

3

18.     The connection between Solar Panels is made at a junction box attached to the back of each Solar Panel. A defect in the junction box and the solder joints between the connecting cables causes the solder joints to overheat.

19.     The junction box fails when the solder joint connecting the cable and busbar fails. The failed joint causes electrical arcing to occur and generates temperatures of 2000-3000 degrees. The electrical arcing results in an immediate total loss of the functionality of the Solar Panel and creates a serious fire safety risk.

20.     The heat caused by this failure melts the junction box, burns the cables and the Solar Panel and shatters the glass cover of the Solar Panel. Attached hereto as **Exhibit D** are photographs of BP Solar Panel junction box failures. If there is flammable material near the heat source, such as dry leaves, the junction box failure creates a high risk of fire. Fires caused by junction box failures have already occurred and there is a substantial risk that they will occur in the future.

21.     Because of the defect in the junction box, all Solar Panels relevant to this litigation have failed or will fail before the end of their expected useful life.

22.     There is no way to repair the defect in the Solar Panels and restore their functionality. The only means for addressing the failure of the Solar Panels is to remove them and replace them with other solar panels.

23.     The defect in the Solar Panels is latent and not discoverable until the customer experiences a junction box failure or fire. Even when there is a junction box failure, substantial time can pass between the failure and discovery because the Solar Panels are on the roof and not typically monitored.

24.     BP ceased manufacturing solar panels of any kind in 2010. BP maintains no inventory of Solar Panels.

**B.      BP's Knowledge and Suppression of the Defect in the Solar Panels**

25.     In approximately 2000, BP engineers were instructed by senior management to cut the cost of producing the Solar Panels. In 2001, BP substantially altered the design of its junction

4

box so that it could be manufactured more cheaply. Between 2001 and 2007, BP manufactured as many as two million Solar Panels using the new junction box design.

26.    The new junction box design eliminated parts that directly impacted the quality and safety of the Solar Panels. Specifically, BP eliminated mechanical terminals which secured the large gauge connecting cables to the junction box. The new design required that these cables be soldered to a flat and extremely thin plate (the "busbar") in the junction box. Because soldering the cables to the busbar does not create a stable and effective connection, this design change made the junction box connection unstable and unsafe.

27.    As early as 2002, BP customers reported failures of the Solar Panels to their installers. The installers reported the failures to their distributors, who in turn reported the failures to BP. Installers also reported failures directly to BP when submitting warranty claims on behalf of their customers.

28.    During 2003, BP customers returned numerous Solar Panels with junction box failures. The appearance of every returned Solar Panel was essentially identical – burned junction boxes and shattered glass – and was immediately understood by BP engineers to be caused by a defect in the design of the junction box.

29.    In or about 2003, BP engineers were instructed by their superiors to investigate the junction box failures. BP engineers investigated the failures throughout 2003 and 2004 and regularly reported their findings to their superiors both orally and in writing. BP engineers determined that the cause of the failures was the separation of the junction box solder joint connections.

30.    In 2003 and 2004, BP tested the junction box and duplicated the electrical arcing failures, proving that the junction box design was defective and created a fire safety risk. BP engineers quickly understood that these junction box failures could not be repaired and such failures would increase over time. BP's testing and analysis revealed that the cable to busbar connection was defective, disposed to premature failure and needed to be redesigned. Over

5

1   time, BP made some minor changes to the design, none of which substantially affected the

2   safety or reliability of the junction box.

3       31.   Beginning in 2003 and repeatedly thereafter, these findings were brought to the

4   attention of numerous BP employees, including Vice Presidents in the manufacturing, sales and

5   marketing, and engineering departments. Many Presidents of BP were also informed of the

6   junction box defect.

7       32.   Contemporaneously with the discovery and investigation of the junction box

8   design defect, BP ramped up its capacity to manufacture and sell the Solar Panels. Manufacturing

9   plants were operated or created in several locations including Maryland, India, Spain and

10  Australia. Marketing plans were implemented worldwide. BP specifically targeted California

11  consumers because of the large energy rebates and tax incentives being offered for installing

12  solar systems.

13      33.   Although it was aware of the junction box defect and its attendant safety risks, BP

14  chose not to stop production or inform its customers of the defect and safety risks. Instead, BP

15  chose to proceed full speed ahead, operating its plants 24 hours a day.

16      34.   From at least 2003 forward, BP insisted that consumers return their defective Solar

17  Panels to BP whenever they asserted a warranty claim for replacement of a failed Solar Panel. In

18  this way, BP further covered up the known defect by preventing customers from conducting

19  independent tests of the Solar Panels which would have revealed the cause of failure. Then, upon

20  receipt of the returned Solar Panels, BP routinely destroyed the evidence by discarding the

21  returned Solar Panels.

22      35.   By 2003, whenever a defective Solar Panel was removed by the installer and a

23  replacement solar panel was requested from BP under the terms of the Warranty, a BP claim form

24  had to be submitted with, among other things, the following information: (1) date of the claim, (2)

25  name of the distributor/dealer/installer, (3) product name and serial number, and (4) the cause of

26  the failure with photographs. A copy of the BP claim form for defective panels is attached hereto as

27  **Exhibit E**. The information was entered into a database. Using the serial numbers, BP is able to

28

6

determine the date and manufacturing location for each Solar Panel. This database evidences BP's comprehensive knowledge of the junction box failure and its signature appearance.

36.     While BP knew from at least 2003 that the junction box defect created a risk of fire, as time passed, BP became aware of actual fires caused by the defect. For example, in the summer of 2009, a junction box failure at a Solar Panel installation in Davis, California started a grass fire which burned 30 acres.

37.     Although BP knew that the junction box defect represented a safety risk and would ensure that consumers would not receive the benefits of ownership promised by BP, BP did not disclose the defect to its distributors, sellers, installers or others in the chain of distribution. Instead, BP actively concealed the defect and sold millions of defective Solar Panels to consumers. BP also told its distributors, sellers, and installers who inquired about the cause of burned or blown Solar Panels that the junction box failures were caused by a "bad batch of glass" or a "bad batch of diodes" rather than the defective junction box. BP did not make any public disclosure of the defect until 2009 and only partial and highly-misleading disclosures concerning the risk of fire until 2012.

38.     At all times relevant hereto, BP was under a continuous duty to disclose to distributors, sellers, installers and end users: (1) the defect in the junction box, (2) the safety issues related thereto, including the risk of fire, (3) the existence of numerous returns of Solar Panels related to the junction box defect and (4) that fires had actually occurred as a result of the defect. BP had this duty because the facts it failed to disclose: (1) are contrary to representations made by BP that the Solar Panels were not defective in design or workmanship, that they would produce the rated power for twenty-five years, that they were safe and that they had a track record of safe operation; (2) relate to a safety issue; (3) were material facts in the exclusive knowledge of BP and unknown to anyone else; (4) were material and actively concealed by BP; and (5) constituted information omitted from statements made by BP concerning the safety and reliability of the Solar Panels.

39.     BP's refusal to correct the defective design of the junction box represented a knowing subordination of the interests of consumers to safe and effective solar power to the

7

1    interest of BP in increased profit. BP's failure to disclose the facts it omitted to disclose to

2    distributors, sellers, installers and end users was deliberate and unconscionable.

3        C.    **Defendants' Warranties and Representations**

4            1.    **The BP Warranty**

5        40.    BP issued a written warranty (the "Warranty") for the Solar Panels which states

6    that: (1) the Solar Panels will be "free from defects in materials and workmanship" for the term

7    of the warranty (the "Defect Warranty"); and (2) the Solar Panels will produce at least ninety

8    percent (90%) of their minimum peak power output for a period of years and at least eighty

9    percent (80%) for a longer period from the date of installation (the "Power Warranty"). In

10   Mohrman's case, the Defect Warranty was for a period of two years and the relevant periods of

11   the Power Warranty were twelve (12) and twenty-five (25) years, respectively. In Allagas' and

12   Ray's case, the Defect Warranty was for a period of five years and the relevant periods of the

13   Power Warranty were also twelve (12) and twenty-five (25) years. A copy of the Warranty

14   received by Ray is attached hereto as **Exhibit F**.

15       41.    The Warranty is enforceable by "(i) the first purchaser who has purchased the

16   [Solar Panels] or (ii) by purchasers of buildings on which the [Solar Panels were] first mounted."

17   Allagas and Ray are first purchasers of the Solar Panels and Mohrman purchased a property on

18   which the Solar Panels were first mounted. All Plaintiffs are thus entitled to enforce the

19   provisions of the Warranty.

20       42.    The Warranty provides that: (1) in the event of a breach of the Defect Warranty,

21   BP will repair or replace the Solar Panels or, at is option, refund the purchase price; and (2) in the

22   event of a breach of the Power Warranty, BP will either (a) repair or replace the Solar Panels or

23   (b) provide the purchasers with additional component(s) to bring the aggregate power output to at

24   least the warranted percentage of the specified minimum power output.

25       43.    Because BP no longer makes the Solar Panels and there are no replacement

26   products with similar dimensions available in the marketplace, BP cannot in fact replace the

27   Solar Panels. Nor is it possible for BP to repair the Solar Panels. Accordingly, the remedies

28   offered by the Warranty fail of their essential purpose, i.e., to put the purchaser in the position he

8

1  or she would have enjoyed but for the breach of the Warranty. The only effective remedy for
2  breach of the Warranty is to remove the existing Solar Panels and replace them with solar panels
3  manufactured by others.

4      44.    The Warranty purports to limit the rights and remedies of purchasers of the Solar
5  Panels in the following particulars:

6      a.    BP disclaims responsibility for "the costs of any on-site labor and any costs
7          associated with the installation, removal, reinstallation or transportation of [the
8          Solar Panels] or any components thereof for service;"

9      b.    BP purports to disclaim any implied warranties, including the warranties of
10          merchantability and fitness for a particular use;

11      c.    BP purports to disclaim responsibility for "any special incidental, consequential or
12          punitive damages arising from the use or loss of use of or failure of [the Solar
13          Panels] to perform as warranted, including but not limited to damages for lost
14          services, cost of substitute services, lost profits or savings, and expenses arising
15          out of third-party claims;"

16      d.    The Warranty purports to limit BP's "maximum liability under any warranty,
17          expressed, implied, or statutory, or for any manufacturing or design defects" to
18          "the purchase price of the product;"

19      e.    The Warranty purports to provide that it is the "purchaser's exclusive remedy for
20          breach of warranty or for manufacturing or design defects;" and

21      f.    The Warranty purports to require that, "Any claim or dispute arising under or in
22          connection with this warranty certificate must be brought in the courts of the
23          State of Maryland, U. S.A."

24      45.    Each of these purported limitations and exclusions (the "Warranty Exclusions") is
25  unenforceable against Plaintiffs and the Class. The Warranty Exclusions were not bargained for
26  by BP and its customers but were imposed unilaterally by BP. The Warranty Exclusions are
27  unfair in that they are outside the reasonable expectations of the parties thereto, deny consumers
28  an effective remedy and purport to limit the rights of consumers in ways that are unenforceable

9

1    under relevant state and federal law including, without limitation, the Song-Beverly Consumer

2    Warranty Act and Magnuson-Moss Warranty Act.

3           46.     The Warranty Exclusions are also unfair in that they purport to limit the rights of

4    BP's customers to repair or replacement of a product which cannot be repaired and for which BP

5    has no replacement.

6           47.     The Warranty Exclusion's purported: (1) limitation of BP's liability to the cost of

7    the Solar Panels; (2) exclusion of "the costs of any on-site labor and any costs associated with the

8    installation, removal, reinstallation or transportation of [the Solar Panels] or any components

9    thereof for service;" and (3) exclusion of incidental and consequential damages are unfair

10   because the cost of removing and replacing the Solar Panels is several times the cost of the Solar

11   Panels themselves.

12          48.     Similarly the increased cost of electricity arising from the failure of the Solar

13   Panels could easily exceed the cost of the Solar Panels themselves. The provision purportedly

14   eliminating the right to recover the cost of replacement electricity is especially unfair in light of

15   BP's prominent claim that installation of the Solar Panels will reduce or eliminate electricity

16   bills "forever."

17          49.     The unfairness of these limitations in remedy are reinforced by unenforceable

18   provisions of the Warranty stating that it is the "exclusive remedy" for "breach of warranty or for

19   manufacturing or design defects" and the purported exclusion of implied warranties. In fact,

20   Plaintiffs and the Class have substantial rights and remedies available to them both for breach of

21   implied and express warranty and for redress arising from the defective nature of the Solar Panels

22   which BP cannot lawfully preclude them from asserting.

23          50.     The warranty provisions described above both individually and in combination,

24   deprive Plaintiffs and the Class of any effective remedy for breach of BP's obligations to them.

25          51.     Finally, the provision requiring that any lawsuit arising "under or in connection

26   with" the Warranty be filed in Maryland is unreasonable and unenforceable because it

27   discourages legitimate claims by imposing unreasonable geographical barriers on the plaintiff. At

28   the time of the events herein alleged, Maryland had no connection to the claims against BP. The

1  cost of asserting claims by California plaintiffs in a forum as remote as Maryland greatly

2  increases the expense of pursuing litigation which is already prohibitively expensive for

3  consumers. Individually and in conjunction with the combined effect of the other Warranty

4  Exclusions, the requirement that suit be brought in Maryland will discourage the pursuit of valid

5  claims by members of the Class.

6         2.    **Additional Representations by BP Concerning the Solar Panels**

7       52.    In addition to the representations contained in the Warranty, BP engaged in a

8  broad mass marketing campaign for the Solar Panels in which BP made, *inter alia*, the following

9  representations and warranties concerning the Solar Panels:

10      a.    Installation of the Solar Panels will "drastically reduce or eliminate your electric

11           bills... forever." (Source: 2005 Video Transcript: BP Solar and The Home Depot

12           team up to provide BP Solar Home Solutions® to home owners).

13      b.    The Solar Panels will "increase the value of your home" and allow homeowners to

14           recover the cost of the Solar Panels "when you sell the house." (Source:

15           2005 Video Transcript: BP Solar and The Home Depot team up to provide BP

16           Solar Home Solutions® to home owners and BP Website 2004 and 2007).

17      c.    BP included language in its Product Data Sheets for the Solar Panels that Model

18           BP 4175B had a "25-year limited warranty of 80% power output; 12-year limited

19           warranty of 90% power output; 5-year limited warranty of materials and

20           workmanship." Similar language is included in the Product Data Sheet for Model

21           BP SX 170B and BP 2150S.

22      d.    "No other system can operate at a higher level of safety than those offered by BP

23           Solar." (Source: BP Website 2002-2005).

24      e.    "Quality, Reliability, and Performance in Every Product. BP Solar products are

25           designed and constructed to provide first class performance and reliability. Our

26           world-class engineers are constantly improving our products to better meet your

27           needs and to ensure product performance and safety through rigorous internal tests

28           and international certifications. It's no wonder our products have an unmatched

11

track record in the field, operating for nearly 30 years in a variety of applications and climates worldwide. Let us introduce you to our distinguishing product features." (Source: BP Website October 2002-November 2006).

    f.    "High Capacity Junction Box. Our proven junction box design provides reliable electrical connections for metric and non-metric conduit or cable fittings and enables series or parallel array connections." (Source: BP Website October 2002-November 2006).

    g.    "Our technology is proven around the globe. BP Solar's technology reliability and durability has been proven in some of the harshest environments on the earth and beyond. Our technology is used on satellites in space, in telecommunication towers on gale-swept mountaintops, for cathodic protection in the cold of Alaska and in remote villages in the heat of Africa." (Source: BP Website February 2003).

    h.    "You can count on our technology; it's proven around the globe. BP Solar's technology reliability and durability has been proven in some of the harshest environments on the earth - and beyond. Our technology is used on satellites in space, in telecommunication towers on wind-swept mountaintops, on weather stations in the bitter cold of Antarctica, and on wells in the searing heat of Africa." (Source: BP Website December 2005-February 2007)

53.    The representations and warranties were broadly disseminated in places such as BP's website, in a video played by to potential customers and in marketing materials such as brochures, product data sheets, and other promotional materials reviewed by Allagas, Ray and other members of the Class. Examples of the representations taken from the BP website are attached hereto as **Exhibit G**. The transcript of the video played to potential customers is attached hereto as **Exhibit H**. Examples of relevant product data sheets are attached hereto as **Exhibit I**.

54.    The representations and warranties made by BP concerning the Solar Panels were false because: (1) the defect in the junction box significantly limited or completely eliminated the ability of the Solar Panels to produce electricity while posing serious risks of property damage

12

and personal injury; and (2) the Solar Panels would not save the property owner money or increase the value of the property.

### D. Misrepresentations and Omissions by BP to the Distribution Chain and End Users in Marketing the Solar Panels

55.     At all times relevant herein, purchasers of the Solar Panels relied on distributors, sellers and installers of solar panels to advise them concerning the advantages of purchasing solar panels generally and of the unique benefits of products produced by particular manufacturers, such as BP. Accordingly, BP knew that if it wanted to sell the Solar Panels to end users it had first to convince distributors, sellers and installers that they should recommend the purchase of BP products rather than solar panels manufactured by others.

56.     BP's marketing plan for the Solar Panels relied almost exclusively on authorized distributors and sellers to promote its products and recommend the Solar Panels to end users – homeowners and small businesses

57.     Attached hereto as **Exhibit J** is an excerpt from a PowerPoint presentation produced by BP and given to builders and developers. This excerpt demonstrates graphically the strategy of using distributors, dealers and installers to sell the Solar Panels to end users. It describes a "partnership" to produce an offer "jointly developed by BP Solar/your company" to do "marketing of BP Solar and your company" and provides that "distributors and Dealers will support the sales process with you." The flow chart shows that the marketing effort flows from BP Solar to Distributors and Builder/Installers to "Homeowners." It also proposes that BP and "your company" will do "co-marketing, demo systems and builder training" which are "focused on building brand preference with installers, builders."

58.     The installation of a solar system is expensive, usually costing tens of thousands of dollars. For this reason, end users need to be persuaded as to why this expenditure is economically reasonable. The principal justification for such a large expenditure is the amount which the homeowner can save over the life of the installation in the cost of electricity which would, in the absence of the solar panels, have to be purchased from utility companies.

13

59.     During the time period relevant herein, BP consistently produced promotional materials touting the economic benefits, safety and reliability of its products. Examples of such promotional materials and the representations they contain are given at Paragraphs 52 through 53 and in the Exhibits attached thereto. BP provided distributors, sellers and installers with its promotional literature and materials – such as brochures, product data sheets, videos, warranty information and other similar materials – and trained them to use BP's promotional materials to promote sales of the Solar Panels.

60.     BP intended that the promotional material it made available to distributors, sellers and installers of the Solar Panels would be provided by distributors, sellers and installers to end users. These promotional materials were produced by BP so that BP could convey to prospective purchasers consistent and effective representations concerning the economic benefits and safety of owning solar panels generally and the benefits of BP's Solar Panels in particular.

61.     Plaintiffs and other members of the Class received BP's promotional materials from distributors, sellers and installers in precisely the manner that BP intended. Plaintiffs' exposure to BP's representations and promotional materials through distributors, sellers and installers is detailed in Paragraphs 86 through 89 (Allagas) and 107 through 108 (Ray) hereto and the Exhibits referred to therein. More general examples of BP's dissemination of its promotional materials to end users through distributors, sellers and installers which are particularly relevant to this litigation are detailed below.

62.     During the time period relevant herein, Solar Depot was the largest authorized distributor of BP Solar Panels in the United States and the largest distributor of Solar Panels in California. Home Depot was also a large authorized distributor of the Solar Panels. Both Home Depot and Solar Depot obtained promotional materials from BP which they provided to sellers and installers of the Solar Panels. Both Solar Depot and Home Depot instructed sellers and installers to deliver these materials to prospective end users and trained them in their use.

63.     For example, in 2004, BP launched a marketing campaign to sell the Solar Panels through Home Depot as the BP Solar Home Solution®. Mohr Power Solar, Inc. ("Mohr Power"),

1   who made the sales presentation to Allagas, worked closely with Home Depot and participated in

2   selling the BP Solar Home Solution.

3          64.     Mohr Power sold BP solar panels from 2002 until BP left the market. BP provided

4   Mohr Power with marketing materials and training on how to install, market and sell the Solar

5   Panels. Mohr Power was an approved installer of the BP Solar Home Solution and was provided

6   with Home Depot and BP marketing materials touting the benefits of the BP Solar Home

7   Solution. Mohr Power was also was required to have an employee on site at each of the thirteen

8   Southern California Home Depot locations for a specified number of hours per week to help

9   market the BP Solar Panels.

10          65.     In 2005, when Mohr Power visited Allagas, Mohr Power had BP brochures with

11   both the BP Solar and Home Depot logos. Mohr Power used the materials to market and sell the

12   Solar Panels to Allagas and others.

13          66.     Solar Depot sold the Solar Panels throughout its vast dealer network. This network

14   included Diablo Solar Services, Inc. ("Diablo Solar"), located in Martinez, California, which

15   installed Ray's Solar Panels. Solar Depot provided its dealers and installers with marketing

16   materials and product information produced by BP and held training seminars to educate them

17   concerning how to sell the Solar Panels.

18          67.     In addition, BP enlisted Solar Depot and its other authorized distributors to recruit

19   installers for its Certified Installer Program. The Certified Installer Program was a two-day

20   training program consisting of workshops and seminars lead by BP sales and marketing

21   representatives. The first day was focused on "sales and marketing" where installers would

22   "[l]earn how to effectively sell BP Solar products, how to use online tools available through the

23   Certified Installer Program; and how to use the BP Solar Certified Installer logo, promotional

24   materials, and marketing templates." The purpose of the Certified Installer Program was to

25   disseminate information about the purported safety, durability, reliability and economic benefits

26   of the Solar Panels to potential end users.

27          68.     In a brochure it produced in a co-branded marketing effort with Solar Depot, BP

28   stated that the Certified Installer Program "connects everyone in the value chain." A flow chart

contained therein reflects the distribution channel from "BP Solar - Authorized Distributors - Certified Installers - Customers." A true and correct copy of the brochure is attached hereto as **Exhibit K**.

69.     Installers who successfully completed the training program received a package of information from BP which contained marketing materials, including brochures, product data sheets, and copies of the BP Warranty, which were then provided to prospective purchasers of the Solar Panels. Installers who did not take part in the Certified Installer Program could not trade on the BP name or use the BP logo in selling its products.

70.     The misrepresentations and omissions by BP alleged in Paragraphs 37, 38, 39, 52 and 53 persuaded distributors, sellers and installers to promote the sale of the Solar Panels to end-users. Throughout the time period relevant herein, such distributors, sellers and installers relied upon the material misrepresentations and omissions by BP concerning the reliability, durability and economic benefits of the Solar Panels and omissions by BP regarding the junction box defect and fire safety risk in marketing the Solar Panels to end users. BP, the distributors, sellers and installers likewise intended that end users would rely on these same representations.

71.     If BP's authorized distributors, sellers and installers had been aware of either (1) the falsity of BP's representations that the Solar Panels were "free from defects in materials and workmanship" and the other representations made in its marketing materials or (2) the information BP failed to disclose concerning its knowledge of the defect of the junction box, the number of Solar Panels which had been returned to BP with burned junction boxes and the risk of electrical arcing and fire, they would have recommended that Plaintiffs and the Class not purchase the Solar Panels and instead select another solar panel manufacturer. If the distributors, sellers and installers had recommended against purchasing the Solar Panels, Plaintiffs and the Class would not have purchased them. If members of the Class had been aware from any source of these misrepresentations and omissions, they would not have purchased the Solar Panels.

///

///

16

E.    **BP's Offers and Product Advisory**

72.    As BP received an increasing number of claims arising from the failure of its Solar

Panels, BP extended two offers to purchasers which purported to compensate purchasers of

defective Solar Panels. In fact, these offers were intended to persuade purchasers of the Solar

Panels to accept wholly inadequate remedies and to allow BP to pay much less than it would be

required to pay if the purchasers of its products received the compensation to which they were

entitled.

1.    **The 2009 Offer**

73.    On October 28, 2009, BP made an offer (the "2009 Offer") to purchasers of the

Solar Panels manufactured through 2006 whereunder: (1) BP would pay $475 to inspect

installed Solar Panels; and (2) $100 per Solar Panel towards the cost associated with the removal

and replacement of a defective Solar Panel. A copy of the 2009 Offer is attached hereto as

**Exhibit L**. The 2009 Offer does not cover the actual cost of removing and replacing the

defective Solar Panels or damages for loss of power.

2.    **The 2010 Offer**

74.    On June 10, 2010, BP made another offer (the "2010 Offer") to address claims

arising after the date of the offer. The 2010 Offer included the same $475 for inspection of the

Solar Panels but reduced the amount of compensation per panel if more than ten Solar Panels were

determined to be defective. A copy of the 2010 Offer is attached hereto as **Exhibit M**. Like the

2009 Offer, the 2010 Offer does not cover the actual cost of removing and replacing the

defective Solar Panels or damages for loss of power.

3.    **The Product Advisory**

75.    On July 25, 2012, BP issued a Product Advisory (the "Product Advisory") which

purports "to communicate a potential risk when using certain BP Solar modules in specific types

of installations." A copy of the Product Advisory is attached hereto as **Exhibit N**. The Product

Advisory states that testing has revealed a "limited risk of cable to busbar disconnection in the

junction box that, in rare cases, may lead to a thermal event." The Product Advisory is limited to

a small number of models manufactured between March 1, 2005 and October 31, 2006 and

17

applies only when the Solar Panels are (1) "mounted on a roof with no fire resistance rating per UL790 or ASTM E108," i.e., a roof "with no Class A, B or C fire resistance rating per UL790 or ASTM E108;" (2) "integrated into a roof covering" or "ground-mounted above flammable material." Purchasers who meet these criteria are told only that they should contact BP.

76.     The Product Advisory greatly understates the risks associated with the junction box failure. First, the risk of junction box failure exists for all Solar Panels – not just the limited number listed in the Product Advisory – manufactured at any time – not just the limited time frame covered by the Product Advisory. Second, the risk of a fire (euphemistically described as a "thermal event") exists even where a roof is fire resistance rated and its occurrence is not "rare." Third, the risk of a junction box failure includes the risk of an electric shock not mentioned in the Product Advisory if someone is on the roof at the time of a failure.

### 4.     BP's Failure to Warn Class Members and its Effects

77.     BP has been aware of the defect in its Solar Panels since at least 2003. BP has long been aware that a junction box failure will eliminate or substantially reduce the capacity of its Solar Panels to generate power and can pose the risk of property damage and personal injury.

78.     Plaintiffs are informed and believe and thereon allege that BP has received hundreds, if not thousands of reports by distributors, sellers, installers, and owners of the failed Solar Panels. Despite its knowledge of these claims and the defect in the junction box, BP did not – except for the grossly misleading Product Advisory – disclose the junction box defects or the risk of property damage and personal injury to its customers.

79.     Members of the Class generally do not know when a junction box failure has occurred until they have suffered such a dramatic loss of power that their electricity bills increase substantially. This fact, combined with BP's refusal to provide reasonable and adequate notice to members of the Class regarding safety-related defects in the Solar Panel and the associated risks, severely compromises the rights of class members to be apprised of and make legitimate claims against BP. This unfair practice by BP further places members of the Class at risk of property damage and personal injury because they do not take action to replace the Solar Panels promptly, as they would if they were warned of the safety risks.

18

### F.   BP's Claims Suppression Strategy

80.    BP has made a practice of offering homeowners who make claims substantially less than the amount to which they are entitled, i.e., the cost of removing and replacing the defective Solar Panels and remedying any consequential damages. Plaintiffs are informed and believe and thereon allege that BP is routinely offering parties who assert claims a payment based on a standard cost per watt for the power warranted, a sum which does not compensate the owner for the cost of removal and replacement of the Solar Panels and any consequential damages. Such damages include, without limitation, lost power production, replacement of the inverters, replacement of the racking system and the cost of new building permits to install the new solar system. Such damages also include repairs to the roof required by replacement of the racking system which is often not compatible with the replacement solar panels.

81.    Plaintiffs are informed and believe, and thereon allege that BP invokes the Warranty Exclusions which it knows are not enforceable against the Class in order to justify these wholly inadequate offers.

82.    In addition, the offer is conditioned upon the agreement by the owner not to pursue litigation against BP. Plaintiffs are informed and believe that BP routinely insists on a provision in the Warranty which requires the owner to surrender possession of the failed Solar Panels to BP. BP has in fact threatened to sue an installer who allegedly did not return all panels to BP.

83.    In this manner, BP attempts to settle cheaply with potential class action representatives who could fairly represent the interests of all purchasers. It also ensures that BP recovers any Solar Panels which could provide proof of the defect if analyzed by experts.

84.    BP utilized the 2009 and 2010 Offers and the Claim Suppression Strategy described in the preceding paragraphs to under-compensate owners and ensure that there will be no proceeding in which all owners can receive the remedies they are entitled to under applicable law.

85.    In its most recent offers to claimants, BP has reduced the amount per watt from $1.60 to $1.10. Alternatively, if claimants want to get replacement modules, BP has a "supply" of third party modules that the customer can choose from but the customer is responsible for

19

1   removal and replacement of the existing Solar Panels and any consequential damages, including

2   the cost to repair damage to the roof resulting therefrom.

3   **IV.   PLAINTIFFS' INDIVIDUAL ALLEGATIONS**

4       **A.   Allagas**

5       86.   In June 2005, while Home Depot was marketing the BP Solar Home Solution,

6   Allagas went to Home Depot to purchase parts for his work as a security systems installer. Just

7   inside the door he saw a large and conspicuous table with marketing information and brochures

8   advertising solar power. Thinking about retirement, Allagas wanted to reduce the cost of his

9   utilities. He had already installed energy efficient windows and was interested in exploring solar

10   power.

11       87.   Allagas was given a marketing presentation by the Home Depot sales

12   representative. He was told that the Home Depot solar system would provide the most "reliable"

13   and "trustworthy" solar system that money could buy. Allagas asked for additional details and he

14   was told to "sign up" for a visit by a Home Depot installer who would provide additional details

15   concerning the Home Depot solar system. Allagas received marketing brochures and other

16   materials at Home Depot which he took home and further reviewed while contemplating his

17   decision to purchase the Solar Panels. At the time he received the brochures, Home Depot

18   provided its customers with brochures and other written materials generated by BP for use in

19   marketing the BP Solar Home Solution.

20       88.   Allagas was subsequently contacted by Mohr Power, a BP Certified Installer

21   selected by BP and Home Depot. As detailed previously Mohr Power was an authorized installer

22   of the Solar Panels, had received all promotional materials used in the sale of the Solar Panels

23   from BP and had been trained by BP concerning how to use the materials to sell the Solar Panels.

24   See Paragraphs 63-65 supra.

25       89.   A Mohr Power representative came to the Allagas home and made a sales

26   presentation about the BP Solar Home Solution. The Mohr Power sales representative brought

27   with him brochures, product data sheets, the Warranty and other written materials concerning

28   the Solar Panels. The Mohr Power representative stated that the Solar Panels were reliable, safe,

and would last for 25 years. Mohr Power asked to see Allagas' electric bills and made calculations about their energy savings. Mohr Power told Allagas that the BP solar system would "eliminate" his electric bills and increase the value of his home.

90.     At no time did anyone from Home Depot or Mohr Power inform Allagas of the known junction box defect and potential fire safety risk of the Solar Panels.

91.     As a result of statements made by the Home Depot sales representative, the Mohr Power sales representative and Allagas' review of the written materials he obtained from Home Depot and during his meeting with Mohr Power, Allagas formed the impressions that: (1) the Solar Panels were safe and reliable; (2) the Solar Panels would last for twenty-five years; (3) the Solar Panels would produce between 80 and 90 percent of their rated power for the years specified; (4) installation of the Solar Panels would eliminate his electric bills and increase the value of his home; and (5) the Solar Panels had a good "track record" of performance.

92.     Allagas relied on the representations and warranties stated in Paragraph 89. Were it not for these representations and warranties, Allagas would not have purchased the Solar Panels. Had Home Depot, Mohr Power, or any other person informed Allagas that the junction box design was prone to failure and posed a fire safety risk, he would not have installed the Solar Panels at his home. Allagas was so convinced by the representations regarding the Home Depot solar system that he refinanced his home to obtain the funds to purchase the solar system.

93.     In 2005, Allagas purchased the BP Solar Home Solution from Home Depot to be installed at his residence in San Bernardino, California for $24,422. The solar system consisted of twenty-four (24) BP 4175B Solar Panels and was installed by Mohr Power on December 23, 2005. The system has two inverters with two strings of six panels per inverter. The inverters convert the variable direct current output of the Solar Panel into alternating current which can be used to power the home.

94.     The Defect Warranty provided to Allagas was for five years. The Power Warranty was a 12-year warranty of 90% power output and a 25-year warranty of 80% power output.

21

95.     In mid-2006, Allagas became concerned when he noticed that one of the Solar Panels in the bottom string was brown in color and "looked different" from the others. Mohr Power came out to look at the Solar Panel and reported to Allagas that his system was fine.

96.     In September 2013, Allagas noticed that his system was not working properly. Allagas contacted Mohr Power who inspected his system on September 13, 2013, and verified that one of the two inverters was no longer working at all. The Mohr Power technician told Allagas that BP had recalled some of their solar panels, but that there was no way to know whether the problem was with the solar panels or the inverter without further inspection. The technician was unable to get on the roof at that time and told Allagas that a second Mohr Power technician would come out to determine the cause of his system failure. Allagas paid Mohr Power $130.00 for the inspection of his solar system.

97.     On September 23, 2013, Mohr Power returned to Allagas' residence and determined that four (4) Solar Panels were "not working" and only one of the inverters was working. Allagas was informed that the Solar Panels had burned junction boxes and the glass surface of two Solar Panels had shattered as a result of the resulting heat.

98.     The loss of power from the four Solar Panels caused more than half of Allagas' system to stop working. When Mohr Power informed Allagas of the location of the four Solar Panels, Allagas learned for the first time from the Mohr Power technician that the browned and discolored Solar Panel that he previously contacted Mohr Power about was one of the four panels with the junction box failure. It was then that Allagas realized that he had been losing power for a prolonged period of time. Allagas paid Mohr Power $157.50 for the second inspection.

99.     After reviewing his electrical bills, Allagas estimates that the first defective Solar Panel from 2006 disabled approximately 25% of his system. When one Solar Panel in a string fails, the entire string fails to generate power. With the first failure, only three of the four strings of six panels were working. Allagas estimates that the loss of the four defective Solar Panels reduced his total energy production by more than 50%. This loss of power was the result of a defect in the Solar Panels which constituted a breach of the Defect Warranty. The resulting loss of power also resulted in a breach of the Power Warranty.

22

100.    Upon learning about the four defective Solar Panels in late 2013, Allagas asked Mohr Power what they were going to do to repair his solar system. Mohr Power told Allagas that they would submit a warranty claim on his behalf to BP and request replacement panels, but that the process would take four to six weeks. Allagas was informed by Mohr Power that BP would supply replacement panels, but Allagas would be responsible for the cost to remove and replace the defective Solar Panels and would have to return the defective Solar Panels to BP.

101.    Allagas followed up with Mohr Power a month later and he was told that they had notified BP of Allagas' claim but had not received any response from BP. Allagas asked Mohr Power to have BP contact him directly. Allagas did not hear from BP until he retained counsel.

102.    Allagas' Solar Panels are listed in the Product Advisory as being at risk for junction box failure and the associated fire safety risk. Because of this fact and because the remaining Solar Panels will fail within their useful life, Allagas has demanded that BP replace the entire solar system.

103.    On October 24, 2013, Allagas' counsel provided BP with further notice of its breach of warranty and CLRA violations and demanded compensation for the cost of removing and replacing the Solar Panels and consequential damages. A copy of the Notice is attached hereto as **Exhibit O**. On November 5, 2013, BP offered Allagas $6,720 to purchase and install new panels. The settlement value was calculated using the formula of $1.60 per watt ($1.60 x 175 watts x 24 panels = $6,720.00), and does not include damages for loss of power production, the cost of the removal and replacement of the racking system, repair of roof damage, the cost of removing and replacing the inverters, the cost of building permits or investigation costs. The estimated cost to remove and replace the Solar Panels at Allagas' residence is over $20,000.

104.    BP also offered Allagas the alternative of having a third party installer selected by BP remove and replace the defective Solar Panels but did not offer to compensate him for any consequential damage such as loss of power, damage to the roof from the repair or expenses of investigation. For the reasons stated in Paragraphs 137 through 139, Allagas did not accept this offer.

/ / /

23

105.   Allagas has made a demand to BP for the cost of removing and replacing the Solar Panels, the amount of electric bills he had to pay to replace power that was supposed to be generated by the Solar Panels, the cost of investigating the failure of his Solar Panels and other consequential damages purportedly excluded by the Warranty. Allagas continues to incur increased electric bills as a result of the reduced capacity of his original system.

106.   Despite repeated requests for a response to this demand, BP has not responded with anything but the offer described above.

**B.   Ray**

107.   For many years, Ray had been interested in solar power as a way to reduce his electric bills. Ray spoke to various installers and chose Diablo Solar to install his Solar Panels. As described previously, Diablo Solar worked closely with Solar Depot, the largest distributor of BP solar panels in California. Solar Depot had obtained and provided to Diablo Solar copies of the BP's product data sheets, the Warranty and other promotional documents.

108.   Diablo Solar visited the Ray residence and made a sales presentation regarding the Solar Panels. The Diablo Solar representative told Ray that the Solar Panels were the best, most reliable and safest on the market. He was also told that the Solar Panels would last for 25 years and would all but eliminate his electricity bill. At that time, Ray received marketing brochures and the Warranty from the Diablo Solar representative to review. Ray reviewed the brochures and the Warranty with the Diablo Solar representative and again on his own before agreeing to purchase the Solar Panels.

109.   As a result of statements made by the Diablo Solar representative and his review of the written materials he obtained during his meeting with Diablo Solar, Ray formed the impressions that: (1) the Solar Panels were safe and reliable; (2) the Solar Panels would last for twenty-five years; (3) the Solar Panels would produce between 80 and 90 percent of their rated power for the years specified; (4) installation of the Solar Panels would eliminate his electric bills and increase the value of his home; and (5) the Solar Panels had a good "track record" of performance.

/ / /

24

110.     Ray relied on the representations and warranties stated in Paragraph 108. Were it not for these representations and warranties, Ray would not have purchased the Solar Panels. Had Diablo Solar or any other person informed Ray that the junction box design was prone to failure and posed a fire safety risk, he would not have installed the Solar Panels at his home. In addition, if Ray had been informed that installation of the Solar Panels constituted a safety risk because of the risk of fire, he would have insisted that the Solar Panels immediately be removed from his roof and replaced with safe solar panels.

111.     In 2005, Ray purchased a BP solar system from Diablo Solar to be installed at his residence in Brentwood, California. The total cost of the system was $24,026.60. The solar system consisted of eighteen (18) BP SX 170B Solar Panels and was installed by Diablo Solar on August 31, 2005.

112.     The Defect Warranty provided to Ray was for five years. The Power Warranty was a 12-year warranty of 90% power output and a 25-year warranty of 80% power output.

113.     In or about July 2010, Ray noticed an increase in his electric bills. As a result, in July and August 2010, Ray contacted Diablo Solar to inspect his solar system. Diablo Solar found three Solar Panels with burn marks. During 2010, until the defective Solar Panels were replaced, the power production of the panels on the Ray property was below the levels stated in the Power Warranty.

114.     In August 2013, Ray again noticed a problem with his solar system and contacted Diablo Solar. Diablo Solar found an additional Solar Panel with a blown junction box which was replaced. As a result, during 2013, the power production was below the levels stated in the Power Warranty.

115.     All of the Solar Panels removed from Ray's residence by Diablo Solar were due to junction box failures evidenced by burn marks and shattered glass.

116.     These failures result from a defect which constitutes a breach of the Defect Warranty. The inability of Ray's Solar Panels to produce the represented power levels also resulted in a breach of the Power Warranty. Ray's Solar Panels are listed in the Product Advisory and

1   identified as a potential safety risk. Because of this fact and because the remaining Solar Panels will

2   fail within their useful life, Ray has demanded that BP replace the entire solar system.

3   117.   In August of 2013, Ray notified Diablo Solar of the breach by BP of the Warranty

4   and Diablo Solar in turn notified BP of the breach.

5   118.   On September 9, 2013, Ray received an e-mail from a BP representative who

6   offered Ray $4,896.00 to replace his solar system. The settlement value was calculated using the

7   formula of $1.60 per watt ($1.60 x 170 watts x 18 panels), and does not include damages for loss

8   of power production, the cost of the removal and replacement of the racking system, the cost to

9   repair the resulting roof damage, the cost of the removal and replacement of the inverter, or cost

10  of building permits. Ray obtained a bid from Diablo Solar, the original installer, for the removal

11  and replacement of the Solar Panels at a cost of $12,704. In addition to the cost to remove and

12  replace the solar system, Ray has incurred increased electricity bills that he would not have

13  incurred if his system were functioning properly.

14  119.   BP also offered Ray the alternative of having a third party installer selected by BP

15  remove and replace the Solar Panels, but did not offer to compensate him for any consequential

16  damage such as loss of power, damage to the roof from the repair or expenses of investigation. For

17  the reasons stated in Paragraphs 137 through 139, Ray did not accept this offer.

18  120.   On November 27, 2013, Ray's counsel provided BP with further notice of BP's

19  breach of warranty and CLRA violations and demanded compensation for the cost of removal

20  and replacement of the modules, replacement of the racking system and for the cost of

21  electricity to replace the energy the Solar Panels failed to produce.

22  121.   On December 4, 2013, Ray provided BP with a copy of the replacement bid from

23  Diablo Solar and also demanded consequential damages from BP for the loss of power, the cost

24  of removal and replacement of the racking system and the cost to repair any damage to the roof.

25  122.   Despite repeated requests for a response to this demand, BP has not responded

26  with anything but the offer described above.

27  ///

28  ///

26

## C. **Mohrman**

123.     On or about June 1, 2012, Mohrman purchased a home in Danville, California on which twenty (20) BP 2150S Solar Panels were installed. The previous owner of the property purchased the Solar Panels from Next Energy Corporation ("Next Energy") in 2001 and installed the in or about January of 2002. Mohrman was provided by the owner with a copy of the Solar Electric Agreement with Next Energy

124.     The presence of a solar system was an important consideration to Mohrman when he purchased the property because of the energy cost savings. Mohrman was willing to pay a higher price for the property because of the solar system. Had Mohrman been aware of the facts that BP was obligated to disclose, he would not have purchased the property or would have adjusted his price to reflect the cost of replacing the solar system.

125.     The solar system was working at the time Mohrman purchased the property. However, when Mohrman moved into his residence in June of 2012, the solar system was no longer generating electricity. Mohrman contacted Next Energy, the original installer, who inspected the solar system and verified the system was not working. Two of the Solar Panels installed at the property had burn marks indicative of junction box failures.

126.     On January 18, 2013, Mohrman provided BP with notice of the defective Solar Panels. BP's experts conducted an inspection of Mohrman's property on July 8, 2013. Preliminary testing of the Solar Panels by BP's experts indicated that 11 of the 20 Solar Panels installed at the Mohrman Property were not generating electricity. The nine remaining Solar Panels, two of which had previously been replaced, were at various stages of failure.

127.     After BP's experts connected the nine Solar Panels to a string to determine the amount of electricity being generated, Mohrman inquired if he could turn on his system with the nine working Solar Panels. BP's experts recommended that the system be turned off due to the risk of fire. For this reason, Mohrman made arrangements to have all of the defective Solar Panels removed from his home. At this time, Mohrman has no solar system and continues to incur damage for lost energy production.

/ / /

128.     As a result of the junction box failures, Mohrman's solar system was completely inoperable and failed to generate the power levels promised in the Power Warranty. Between July 2012 and June 2013, Mohrman has paid increased energy costs totaling $2,909.13 as a direct result of the lost energy production from the Solar Panels.

129.     After retaining counsel, BP offered Mohrman financial compensation of $12,000 with which to purchase and install new panels. This amount was calculated by BP in the same manner as the offers made to Allagas and Ray, i.e., by multiplying the wattage of the Solar Panel by a fixed dollar amount. This amount is insufficient to remove and replace Mohrman's Solar Panels. Mohrman has obtained an estimate that such removal and replacement will cost $33,696.00.

130.     On October 30, 2013, Mohrman submitted a demand of $60,000 to BP which included the cost for the cost of removing and replacing the Solar Panels, the amount of electric bills he had to pay to replace power that was supposed to be generated by the Solar Panels, the cost of investigating the failure of his Solar Panels and other consequential damages.

131.     Despite repeated requests for a response to this demand, BP has not responded with anything but the offer described above.

**D.     Plaintiff Dickson**

132.     In or about June 2009, Dickson purchased a home in Oakdale, California on which twenty-eight (28) BP 4170S Solar Panels were installed.

133.     The presence of a solar system was an important consideration to Dickson when he purchased the property because of the energy cost savings. Had Dickson been aware of the facts that BP was obligated to disclose, he would not have purchased the property or would have adjusted his price to reflect the cost of replacing the solar system.

134.     In or about November 2013, Dickson noticed that one of his inverters was offline. His solar system was inspected by a solar installer who confirmed that one of Dickson's BP4170S Solar Panels failed. The panel failed due to a junction box failure evidenced by burn marks and shattered glass.

///

28

1

### E.      **Facts Common to All Plaintiffs**

2     135.     BP's refusal to pay for: (1) "on-site labor and any costs associated with the

3 "removal, reinstallation or transportation of [the Solar Panels]" or (2) "any special incidental,

4 consequential or punitive damages arising from the use or loss of use of or failure of [the Solar

5 Panels] to perform as warranted, including but not limited to damages for lost services, cost of

6 substitute services, lost profits or savings" and the making of an offer amounting to no more than

7 "the purchase price of the product" represents enforcement of the Warranty Exclusions

8 described in subparagraphs (a) through (e) of Paragraph 44 against Plaintiffs. Likewise, BP's

9 insistence in this litigation that the exclusion of implied warranties referenced in subparagraph

10 (b) of Paragraph 44 is valid also constitutes an attempt to enforce the Warranty Exclusions

11 against Plaintiffs.

12     136.     BP's actions also represent the implementation of the Claim Suppression Strategy

13 against Plaintiffs in that: (1) BP has offered Plaintiffs "substantially less than the amount to

14 which [they are] entitled" based part on the Warranty Exclusions; and (2) BP's offer is

15 conditioned on an agreement not to assert claims against BP.

16     137.     The racking systems used to mount the Solar Panels are not the same size as the

17 racking systems that are used for products which can replace the Solar Panels. For this reason, the

18 removal and replacement of the Solar Panels cannot be accomplished without replacing the

19 racking systems to which the Solar Panels are attached. This replacement damages the roof and,

20 unless addressed by the installer, has a serious adverse effect on the appearance of the roof. In

21 many cases where BP employed its own installers to install third-party solar panels, the installers

22 they did not repair the damage caused by the replacement of the mounting racks or ameliorate the

23 adverse changes to the appearance of the roof.

24     138.     The fact that BP offered such a small amount to replace the roof, in each case

25 approximately one-third of the actual cost of a competent repair, indicated to Plaintiffs that they

26 could not trust BP's suggestion that BP's installers, rather than installers selected by Plaintiffs,

27 repair the roof.

28 / / /

139.    For this reason, as well as BP's refusal generally to compensate Plaintiffs for their substantial consequential damages, Plaintiffs did not accept BP's suggestion that it "cure" their default by having its own installers replace their Solar Panels.

## V.    CLASS ALLEGATIONS

140.    The Class which Plaintiffs seek to represent in this action is :

>   All persons or entities in the United States (a) who purchased Class Panels for initial installation on a property or purchased properties on which Class Panels had first been installed, and (b) who currently own some or all of those Panels.

141.    Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, and Defendants' legal representatives, heirs and successors, and any judge to whom any aspect of this case is assigned, and any member of such a judge's immediate family.

142.    Claims for personal injury are excluded from the claims of the Class.

143.    Plaintiffs reserve the right to modify or amend the Class definition, as appropriate.

144.    Individual and representative Plaintiffs bring this lawsuit as a class action, on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23.

145.    Certification of Plaintiffs' claims for class wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis and because this case meets the requirements of Federal Rule of Civil Procedure 23.

146.    **Numerosity**. The members of the Class are so numerous that individual joinder of all the members is impracticable. Plaintiffs are informed and believe, and thereon allege, that there are at least thousands of purchasers who have been damaged by the conduct alleged herein.

147.    **Commonality and Predominance**. This action involves common questions of law and fact which predominate over any questions affecting individual class members including, without limitation, the following:

>   a.      Whether Defendant BP violated California's Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq*., by, among other things, engaging in unfair, unlawful, or fraudulent practices;

30

b.      Whether Defendants breached their implied warranties to Plaintiffs and the Class;

c.      Whether Defendant BP violated California's Consumer Legal Remedies Act, Civ. Code § 1750 *et seq.*, by falsely advertising the Solar Panels were of a certain quality when in fact, they were not;

d.      Whether Defendant BP breached its express warranties to Plaintiffs and the Class;

e.      Whether Plaintiffs and the Class are entitled to compensatory damages, and the amount of such damages; and

f.      Whether Defendants should be declared financially responsible for the costs and expenses of removal and replacement of all Solar Panels as well as compensation for the lost energy generation capacity of the Solar Panels.

148. **Typicality**. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all members of the Class, have been damaged by Defendants' unlawful conduct, in that Plaintiffs will incur the cost of removing and replacing the defective Solar Panels, and have and will incur the increased costs of electricity resulting from the loss of electricity generation during the period between the failures and replacement. The factual bases and causes of action for Plaintiffs' claims are common to all members of the Class and represent a common course of misconduct resulting in injury to all Class members.

149. **Adequacy of Representation**. Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class and they have retained counsel competent and experienced in complex class action litigation and who specialize in class actions involving defective construction products. Plaintiffs intend to prosecute this action vigorously and the interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

150. **Superiority**. A class action is superior to all other available means for the fair and efficient adjudication of this controversy in that:

a.      The prosecution of separate actions by individual members of the Class would create a foreseeable risk of inconsistent or varying adjudications which would establish incompatible results and standards for Defendants;

31

b.   Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their own separate interests;

c.   Class action treatment avoids the waste and duplication inherent in potentially thousands of individual actions, and conserves the resources of the courts; and

d.   The claims of individual class members are not large when compared to the cost required to litigate such claims. The individual Class members' claims are on average approximately $20,000 to $25,000. Given the high cost of litigation, it would be impracticable for the members of the Class to seek individual redress for Defendants' wrongful conduct. The class action device provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. The case presents no significant management difficulties which outweigh these benefits.

e.   In the absence of the injunctive and declaratory relief requested herein Defendant BP will continue to attempt to enforce the Warranty Exclusions which are not enforceable, resulting in unreasonable settlements in which members of the Class do not receive fair compensation for their injury.

## VI.  **DAMAGE**

151. As a result of the facts alleged herein, Plaintiffs and the Class have been damaged in an amount equal to the difference in value between the Solar Panels had they been as represented by BP and the value of the Solar Panels as actually delivered by BP. In addition,

Plaintiffs and the Class have been or will be compelled to incur cost and expense to, *inter alia*, investigate the reasons for the failure of their Solar Panels, remove and replace the Solar Panels, and pay increased electricity costs resulting from the loss of electricity generated by the Solar Panels. These amounts include sums necessary to repair damage to the roof which occurs because the mounts for the Solar Panels must be removed, as well as the cost of building permits and the cost to replace the inverters for the solar system as alleged herein. In addition, the acts of

32

BP in misrepresenting and omitting relevant facts concerning the Solar Panels, deceiving Plaintiffs and the Class concerning the safety and reliability of the Solar Panels, enforcing the Warranty Exclusions and implementing Claim Suppression strategy were: (1) malicious in that they represent "despicable conduct" carried on by BP "with a willful and conscious disregard of the rights or safety of others;" (2) oppressive in that they represent "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights;" and (3) fraudulent. Accordingly, Plaintiff and the Class are entitled to punitive damages according to proof.

## VII. <u>STATUTE OF LIMITATIONS ISSUES</u>

152.     The defect in the junction box does not become apparent until a sufficient number of Solar Panels have failed, resulting in a loss of power and an increase in utility bills. Even when such failures occur, it is difficult for members of the Class to determine the actual cause of the failure. Accordingly, Plaintiffs did not and members of the Class do not become aware of the misrepresentations and breaches of warranty alleged herein until the defects in the Solar Panels become manifest and the property owner does sufficient investigation to identify the source of the problem. Accordingly, the statute of limitations for the claims asserted herein does not commence to run until some period of time after the Solar Panels have failed.

153.     For the reasons addressed in Paragraph 37 and 38 above, BP was under a continuous duty to disclose to distributors, sellers, installers and end users, including Plaintiffs and the Class, the defect in the junction box, the safety issues related thereto, including the risk of fire, the existence of numerous returns of product related to the junction box defect and the occurrence of fires which actually occurred as a result of the defect.

154.     Despite this duty, BP did not make any general disclosure of the defect in the junction box until 2009, at which time it made misleading and inaccurate disclosures concerning the extent and severity of the defect and the products affected by it. Nor did BP disclose the safety risk associated with the junction box failure until the 2012 Product Advisory. As alleged previously, the Product Advisory grossly misstates the nature and extent of the risk to Plaintiffs and the Class.

155.    In addition, when confronted with the fire damage caused by the Solar Panels, BP actively concealed the cause of the defect and suggested, *inter alia*, that the observed breakage of the glass and burn marks were caused by a bad batch of glass or some other cause unrelated to the defect in the junction box.

156.    Plaintiffs and the Class reasonably relied upon BP's concealment of the defect and its representations concerning the quality of the Solar Panels. As a result of this reliance, Plaintiffs and members of the Class failed to assert claims against BP until they became aware of the failure of the Solar Panels and its cause. Accordingly, BP is estopped to rely on any statutes of limitation in defense of this action.

## FIRST CLAIM FOR RELIEF

### (For Violation of the California Consumer Legal Remedies Act)

### (By Plaintiffs and the Class against BP)

157.    Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs. The defect alleged herein is detailed at Paragraphs 16 through 24. BP's knowledge and concealment of the defect and its obligation to disclose relevant facts is detailed at Paragraphs 25 through 39. BP's representations concerning the Solar Panels and the falsity of those representations is detailed at Paragraphs 40 and 52 through 54. BP's dissemination of its misrepresentations and omissions and its effects on distributors, sellers, installers and end users, including their adverse reliance on these representations and omissions, is detailed at Paragraphs 55 through 71, Paragraph 92 (Allagas), and Paragraph 110 (Ray). BP's inadequate public offers to remedy the problems caused by the Solar Panels and it failure to warn consumers concerning this defect is addressed at Paragraphs 72 through 79. The Warranty Exclusions and their unfairness is detailed at Paragraphs 44 through 51. BP's Claim Suppression Strategy is detailed at Paragraphs 80 through 85. The inability of BP to assert statute of limitations defenses is addressed at Paragraphs 154 through 158.

158. Where relevant, Plaintiffs also refer to the specific factual allegations supporting each element of the claim alleged herein.

159. The Solar Panels are "goods" as defined by Civil Code § 1761(a).

34

160. Defendant BP is a "person" as defined by Civil Code § 1761(c).

161. Plaintiffs and members of the Class are "consumers" as defined by Civil Code § 1761(d) who purchased the Solar Panels for personal, family, and household purposes.

162. The purchase by Plaintiffs and members of the Class of the Solar Panels are "transactions" as defined by Civil Code § 1761(e).

163. Under the Consumers Legal Remedies Act ("CLRA"), Civil Code § 1770, *et seq.*, the following methods of competition and unlawful when any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer:

    a.    Representing that goods ... have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have." Civil Code § 1770(a)(5).

    b.    Representing that goods ... are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7).

    c.    Inserting an unconscionable provision in the contract. Civil Code § 1770(a)(19).

164. Defendant BP violated Civil Code §§ 1770(a)(5) and (a)(7) when it represented, through advertising and other express representations that the Solar Panels had benefits or characteristics that they did not actually have and were of a certain standard or quality, when they were not. These representations and warranties, and the methods by which they were disseminated are detailed at Paragraphs 40, 52, 53 and 55 through 71. The reasons they are false are stated in Paragraph 54. BP also omitted to disclose the facts it was required to disclose pursuant to §§ 1770(a)(5) and (a)(7), as more fully stated in stated in Paragraphs 25 through 39 (duty to disclose addressed in Paragraph 38).

165. Defendant BP violated Civil Code § 1770(a)(19) by including in the Warranty the unconscionable Warranty Exclusions. The Warranty Exclusions and the reasons they are unconscionable are described in Paragraphs 44 through 51.

166. Had Plaintiffs and members of the Class known that the representations and warranties made by BP concerning the Solar Panels were false or had they been aware of the facts

BP was obligated to disclose, Plaintiffs and members of the Class would not have purchased the Solar Panels or purchased properties on which the Solar Panels were installed. Plaintiffs and members of the Class would not have made these purchases because: (1) if distributors, sellers and installers had known of the falsity of BP's representations and warranties, or had BP disclosed the facts it was obligated to disclose, they would have recommended against the purchase of the Solar Panels; and (2) irrespective of such recommendations, if Plaintiffs and the Class had been aware of the falsity of BP's representations and warranties or become aware of the facts BP was obligated to disclose, they would not have purchased the Solar Panels or properties on which the Solar Panels were installed.

167.    The facts supporting the allegations in the preceding Paragraph are detailed in Paragraphs 55 through 71 (particularly Paragraphs 70 and 71) (distributors, sellers and installers), 86 through 92 (Allagas), 107 through 110 (Ray) and 123 through 124 (Mohrman).

168.    As a result of Defendant BP's unfair and deceptive acts and practices, Plaintiffs and members of the Class have been harmed and seek actual damages according to proof, attorneys' fees and costs and such other relief as the court deems proper.

169.    Allagas served Defendant BP with notice of its violations of the CLRA pursuant to Civil Code § 1782 (the "Notice") by certified mail on October 24, 2013. A copy of the Notice is attached hereto as **Exhibit O**. Defendant BP failed to provide or offer to provide remedies for its violations of the CLRA within 30 days of the date of the Notice.

## SECOND CLAIM FOR RELIEF

### (For Breach of Express Warranty)

### (By Plaintiffs and the Class against BP)

170.    Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs. Plaintiffs also refer to the summary of allegations relevant to this Claim for Relief in Paragraph 159.

171.    As relevant, Plaintiffs refer to the specific factual allegations supporting each element of the claim alleged herein.

///

36

172.    BP made the warranties described in Paragraphs 40 (Written Warranty) and 52 (warranties contained in marketing materials).

173.    BP is not entitled to enforce the Warranty Exclusions described in Paragraph 44 because they are unconscionable and violate the provisions of applicable law including, without limitation, the Song-Beverly Consumer Warranty Act and the Magnuson – Moss Warranty Act (Paragraphs 45 through 51).

174.    Because the Solar Panels either have failed or are certain to fail within their expected useful life (Paragraphs 21, 102, 116 and 127-28), BP is in breach of both the Defect Warranty and the Power Warranties contained in the Warranty, as more fully detailed herein. Warranties to the Plaintiffs and the Class have also been breached because the Solar Panels have failed or will fail within their useful life and because the warranties contained in Paragraph 52 were false. Harm to Plaintiffs and the Class is detailed in Paragraph 151.

175.    As detailed above, BP has failed to remedy the breach of the Warranty for either Plaintiffs or the Class (see Paragraphs 103-106).

176.    Although Plaintiffs do not believe that notice to BP of its breaches of warranty are required under applicable law, Plaintiffs have notified BP of its breaches of the Warranty. In addition, the Notice attached hereto as Exhibit O provided BP with timely notice on behalf of the Class of the breach of the Warranty and the invalidity of the Warranty Exclusions alleged herein (Paragraphs 103, 170 and Exhibit O).

177.    Further notice to BP of its breach of the Warranty would be futile because BP is aware of and has acknowledged the defects in the Solar Panels and, because it no longer manufactures the Solar Panels, it cannot provide to Plaintiffs and the Class any remedy other than replacement of the Solar Panels with other panels.

178.    As a result of BP's breach of the Warranty and the warranties detailed in Paragraph 52, Plaintiffs and the Class have suffered damages as detailed in Paragraph 151 in an amount to be proven at trial.

///

///

37

1

**THIRD CLAIM FOR RELIEF**

2

**(Breach of Express Warranty - Magnuson-Moss Warranty Act)**

3

**(By Plaintiffs and the Class against BP)**

4       179.    Plaintiffs incorporate by reference each allegation set forth in the preceding

5   paragraphs. Plaintiffs also refer to the summary of allegations relevant to this Claim for Relief in

6   Paragraph 159.

7       180.    The allegations of this Claim for Relief are based on the breaches of

8   warranty addressed fully in the previous Claim for Relief. The specific allegations of the

9   Complaint relevant to that claim are detailed therein.

10      181.    The Solar Panels are a consumer product as defined in 15 U.S.C. § 2301(1).

11      182.    Plaintiffs and the members of the Class are consumers as defined in 15 U.S.C. §

12   2301(3).

13      183.    BP is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

14      184.    The Warranty contains "written warranties" within the meaning of 15 U.S.C. §

15   2301(6).

16      185.    As alleged previously, BP has breached the Warranty.

17      186.    Additionally, pursuant to 15 U.S.C. § 2304(d)(1), BP may not assess Plaintiffs or

18   the Class any costs the warrantor or his representatives incur in connection with the required

19   remedy of a warranted product... [I]f any incidental expenses are incurred because the remedy is

20   not made within a reasonable time or because the warrantor imposed an unreasonable duty upon

21   the consumer as a condition of securing remedy, then the consumer shall be entitled to recover

22   reasonable incidental expenses which are so incurred in any action against the warrantor." BP has

23   refused to pay all costs associated with the removal and replacement of the Solar Panels.

24      187.    Plaintiffs have provided BP with notice of breach of the Warranty and a

25   reasonable opportunity to cure the breach. In addition, the Notice afforded BP notice on behalf of

26   the Class of its breach of the Warranty and a reasonable opportunity to remedy the breach. BP

27   has failed to remedy the breach of its obligations to the Class under the Warranty.

28   ///

38

188.     Further notice to BP of its breach of the Warranty would be futile because BP is aware of and has acknowledged the defects in the Solar Panels and, because it no longer manufactures the Solar Panels, it cannot provide to Plaintiffs and the Class any remedy other than replacement of the Solar Panels with other panels.

189.     As a result of BP's breach of the Warranty, Plaintiffs and the Class have been damaged as detailed in Paragraph 151 in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

**(Breach of Express Warranty under Song-Beverly Consumer Warranty Act)**

**By Plaintiffs and the Class against BP)**

190.     Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs. Plaintiffs also refer to the summary of allegations relevant to this Claim for Relief in Paragraph 159.

191.     The allegations of this Claim for Relief are based on the breaches of warranty addressed fully in the Third Claim for Relief. The specific allegations of the Complaint relevant to that claim are detailed therein.

192.     The Solar Panels are consumer goods within the meaning of California's Song-Beverly Consumer Warranty Act.

193.     BP is a "manufacturer" within the meaning of the statute.

194.     Plaintiffs and members of the Class purchased Solar Panels within the State of California.

195.     As alleged previously, BP breached the Warranty.

196.     Plaintiffs have provided BP with notice of breach of the Warranty and a reasonable opportunity to cure the breach. In addition, the Notice afforded BP notice on behalf of the Class of its breach of the Warranty and a reasonable opportunity to remedy the breach. BP has failed to remedy the breach of its obligations to the Class under the Warranty.

197.     Further notice to BP of its breach of the Warranty would be futile because BP is aware of and has acknowledged the defects in the Solar Panels and, because it no longer

39

1    manufactures the Solar Panels, it cannot provide Plaintiffs and the Class any remedy other than

2    replacement of the Solar Panels with other panels.

3         198.    As a result of BP's breach of the Warranty, Plaintiffs and the Class have been

4    damaged as detailed in Paragraph 151 in an amount to be proven at trial.

5                              **FIFTH CLAIM FOR RELIEF**

6                             **(Breach of Implied Warranty)**

7                    **(By Plaintiffs and the Class against All Defendants)**

8         199.    Plaintiffs incorporate by reference each allegation set forth in the preceding

9    paragraphs. Plaintiffs also refer to the summary of allegations relevant to this Claim for Relief in

10   Paragraph 159.

11        200.    As relevant, Plaintiffs refer to the specific factual allegations supporting each

12   element of the claim alleged herein.

13        201.    The sale by Defendants of the Solar Panels was accompanied by implied

14   warranties that the Solar Panels were merchantable and fit for the ordinary purpose for which

15   such products were sold (the "Implied Warranties").

16        202.    Home Depot sold the Solar Panels directly to Allagas and members of the Class

17   and they are therefore in direct privity with Home Depot.

18        203.    BP issued the Warranty to Allagas, Ray and the Class. BP extended the benefit of

19   the Warranty to Mohrman and members of the Class. BP is therefore in direct privity with each

20   Plaintiff and all members of the Class.

21        204.    Further, the Implied Warranties incorporated into the transaction between BP and its

22   immediate purchasers (the "BP Buyers") were intended solely to benefit Plaintiffs and the Class.

23   Plaintiffs and the Class are therefore entitled to enforce the Implied Warranties against BP.

24        205.    This intent is evidenced, *inter alia*, by the fact that the written Warranty issued by

25   BP extends not only to end users but to their successors. Further, the Implied Warranties made by

26   BP to the BP Buyers would be of no economic value to the BP Buyers unless Plaintiffs and Class

27   received the benefit of such warranties. The BP Buyers are not users of the Solar Panels. The

28   economic benefit of implied warranties made by BP to the BP Buyers depends on the ability of

                                              40

1   end users who buy their products to obtain redress from BP if the warranties are breached. For

2   this reason, Home Depot expressly disclaims warranties relating to the Solar Panels and agrees

3   only to assist its customers in asserting warranty claims. It is in the best interests of Home Depot

4   and other BP Buyers that Plaintiffs and the Class be permitted to enforce implied warranties

5   against BP.

6        206.    Under *Gilbert Financial Corp. v. Steelform Contracting Co.* (1978) 82 Cal.

7   App. 3d 65, the Implied Warranties made by BP to the BP Buyers are enforceable whether or

8   not Plaintiffs or the Class were in privity of contract with BP.

9        207.    Defendants breached the Implied Warranties in that the Solar Panels are: (1) not

10   fit for their intended use and (2) not of merchantable quality. The Solar Panels are neither

11   merchantable nor fit for their intended use as power replacement because: (1) the latent defect in

12   the Solar Panels (Paragraphs 16 through 24) insures that they will fail well before the end of their

13   useful life (Paragraph 21) and therefore fail to produce electricity; and (2) purchasers of solar

14   panels would not accept the risk of fire posed by the Solar Panels (Paragraphs 18 through 20)

15   when there are other products for sale which do not present this risk.

16        208.    Although Plaintiffs do not believe that notice to BP of its breaches of warranty are

17   required under applicable law, Plaintiffs have notified BP of its breaches of the Warranty. In

18   addition, the Notice attached hereto as Exhibit O provided BP with timely notice on behalf of the

19   Class of the breach of the Warranty and the invalidity of the Warranty Exclusions alleged herein

20   (Paragraphs 103, 170 and Exhibit O).

21        209.    Further notice to BP of its breach of the Implied Warranties would be futile

22   because BP is aware of and has acknowledged the defects in the Solar Panels and, because it no

23   longer manufactures the Solar Panels, it cannot provide to Plaintiffs and the Class any remedy

24   other than replacement of the Solar Panels with other panels manufactured by others.

25        210.    Because the Solar Panels either have failed or are certain to fail within their

26   expected useful life (Paragraphs 21, 102 and 116), BP is in breach of both the Defect Warranty

27   and the Power Warranties contained in the Warranty. Harm to Plaintiffs and the Class is detailed

28   in Paragraph 151.

211.   As detailed herein, BP has failed to remedy the breach of the Warranty for either Plaintiffs or the Class (Paragraphs 103-106).

212.   As a result of the breach of the Implied Warranties, Plaintiffs and the Class have been damaged as detailed in Paragraph 151 in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**

**(Breach of Implied Warranty - Magnuson-Moss Warranty Act)**

**(By Plaintiffs and the Class against All Defendants)**

213.   Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs. Plaintiffs also refer to the summary of allegations relevant to this Claim for Relief in Paragraph 159.

214.   The allegations of this Claim for Relief are based on the breaches of warranty addressed fully in the Fifth Claim for Relief. The specific allegations of the Complaint relevant to that claim are detailed therein.

215.   Plaintiffs and members of the Class are consumers as defined in 15 U.S.C. § 2301(3).

216.   Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4) and (5).

217.   The Solar Panels are consumer products as defined in 15 U.S.C. § 2301(1).

218.   Under 15 U.S.C. §2301(7), Defendants extended the Implied Warranties to Plaintiffs and the Class.

219.   Defendants breached the Implied Warranties by selling Solar Panels that were neither merchantable nor fit for their intended purpose.

220.   Under 15 U.S.C. §2310(e), notice of breach of warranty need not be provided until after Plaintiffs have been appointed Class Representatives.

221.   Plaintiffs have provided BP with notice of breach of the Implied Warranties and a reasonable opportunity to cure the breach. In addition, the Notice afforded BP notice on behalf of the Class of its breach of the Implied Warranties and a reasonable opportunity to remedy the breach. BP has failed to remedy the breach of its obligations to the Class under the Implied Warranties.

42

1    222.    As a result of Defendants' breach of the Implied Warranties, Plaintiffs and the

2    Class have been damaged as detailed in Paragraph 151 in an amount to be proven at trial.

3    **SEVENTH CLAIM FOR RELIEF**

4    **(Breach of Implied Warranty under Song-Beverly Consumer Warranty Act)**

5    **(By Plaintiffs and the Class against All Defendants)**

6    223.    Plaintiffs incorporate by reference each allegation set forth in the preceding

7    paragraphs. Plaintiffs also refer to the summary of allegations relevant to this Claim for Relief in

8    Paragraph 159.

9    224.    The allegations of this Claim for Relief are based on the breaches of warranty

10   addressed fully in the Fifth Claim for Relief. The specific allegations of the Complaint relevant to

11   that claim are detailed therein.

12   225.    Under the Song-Beverly Consumer Warranty Act, Civ. Code § 1792 *et seq.*, every

13   sale of consumer goods in the State of California is accompanied by both a manufacturer's and

14   retail seller's implied warranty that the goods are merchantable.

15   226.    The Solar Panels are consumer goods within the meaning of the statute.

16   227.    Defendant BP is a "manufacturer" and Defendant Home Depot is a "retail seller"

17   within the meaning of the statute.

18   228.    Plaintiffs and members of the Class purchased Solar Panels in the State of

19   California.

20   229.    By operation of law, all Defendants made the Implied Warranties to Plaintiffs and

21   the Class concerning the Solar Panels.

22   230.    Defendants have breached the Implied Warranties by selling Solar Panels

23   which were not of merchantable quality and which failed to perform the tasks for which they

24   were intended.

25   231.    Members of the Class are in privity with Home Depot. Plaintiffs and all other

26   Class members do not have to be in privity with any Defendant in order to enforce the Implied

27   Warranties. Civil Code § 1792, which provides that "[u]nless disclaimed in the manner

28

43

prescribed by this chapter, every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable," has no privity requirement.

232.    Further, for the reasons stated in Paragraphs 206 through 208, Plaintiffs and the Class are intended beneficiaries of the Implied Warranties between BP and the BP Buyers and are therefore entitled to enforce the Implied Warranties against BP.

233.    Plaintiffs have provided BP with notice of breach of the Implied Warranties and a reasonable opportunity to cure the breach. In addition, the Notice afforded BP notice on behalf of the Class of its breach of the Implied Warranties and a reasonable opportunity to remedy the breach. BP has failed to remedy the breach of its obligations to the Class under the Implied Warranties.

234.    Further notice to BP of its breach of the Implied Warranties would be futile because BP is aware of and has acknowledged the defects in the Solar Panels and, because it no longer manufactures the Solar Panels, it cannot provide to Plaintiffs and the Class any remedy other than replacement of the Solar Panels with other panels.

235.    As a result of Defendants' breaches of the Implied Warranties, Plaintiffs and Class members have been damaged as detailed in Paragraph 151 in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

### (For Violation of Unfair Competition Law)

### (By Plaintiffs and the Class against BP)

236.    Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs. Plaintiffs also refer to the summary of allegations relevant to this Claim for Relief in Paragraph 159.

237.    As relevant, Plaintiffs refer to the specific factual allegations supporting each element of the claim alleged herein.

238.    Pursuant to Bus. & Prof. Code § 17200, "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

44

239.    BP's actions, as alleged herein, constitute deceptive, unfair, fraudulent, and unlawful practices committed in violation of the Bus. & Prof. Code § 17200, *et seq*.

240.    All of the conduct and representations alleged herein occurred in the course of BP's business and were part of a pattern or generalized course of conduct.

241.    BP's conduct was unlawful because it violated the Consumer Legal Remedies Act, Magnuson-Moss Warranty Act and Song-Beverly Consumer Warranty Act as previously alleged.

242.    The advertising and sale of the Solar Panels by use of brochures and warranty documents detailed in Paragraphs 40, 52, 53 and 55 through 71 was "fraudulent" because it was likely to and did deceive purchasers into believing that the Solar Panels would be durable and provide safe and reliable power for decades. *See*, Paragraphs 56 through 71, particularly Paragraphs 70 and 71. The Solar Panels are not durable or safe and fail to produce the specified level of power well in advance of the relevant periods under the Warranty (Paragraphs 21 and 54). BP's omission to disclose the facts it was required to disclose as more fully stated in stated in Paragraphs 25 through 39 (duty to disclose addressed in Paragraph 38) is also "fraudulent" under Bus. & Prof. Code § 17200.

243.    BP's deceptive, unfair, fraudulent, and unlawful conduct alleged herein was specifically designed to and did induce Allagas, Ray and members of the Class to purchase the Solar Panels. See Paragraphs 55 through 71, 92 (Allagas) and 110 (Ray).

244.    Plaintiffs and members of the Class reasonably and justifiably relied on Defendant BP's deceptive, unfair, and unlawful conduct alleged herein. But for such conduct, Allagas and members of the Class would not have purchased the BP Solar Panels.

245.    As a result of Defendant BP's unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs and members of the Class have suffered injury-in-fact, lost money, and lost property, in that they have incurred out-of-pocket labor costs and energy loss associated with the faulty solar system, as described more fully herein.

246.    Pursuant to Bus. & Prof. Code §§ 17203, 17204, Allagas, Ray, and the Class seek to recover from Defendants restitution of earnings, profits, compensation and benefit obtained as

1    a result of the practices that are unlawful under Bus. & Prof. Code § 17200 et seq., and other

2    appropriate relief, according to proof.

3        247.    Additionally, by threatening to enforce and actually enforcing the Warranty

4    Exclusions (Paragraph 44), by engaging in the Claim Suppression Strategy (Paragraphs 80

5    through 85) and by understating and failing to disclose the risk of fire resulting from the failure of

6    the Solar Panels (Paragraphs 25 through 39 and 75 through 79), BP acted unfairly and unlawfully

7    against all members of the Class. Members of the Class have been injured and will continue to be

8    injured by the enforcement of the Warranty Exclusions, the Claim Suppression Strategy and the

9    understatement of the risk of fire posed by the Solar Panels. See Paragraphs 135 and 136

10   (Plaintiffs) and 80 through 85, particularly 83 through 85, and 151 (Class).

11       248.    The enforcement and threatened enforcement of the Warranty Exclusions, the

12   Claim Suppression Strategy and the understatement and nondisclosure of the risk of fire

13   resulting from the failure of the Solar Panels are unfair in that they: (1) violate public policy as

14   expressed in the Consumer Legal Remedies Act, the Magnuson-Moss Warranty Act and the

15   Song-Beverly Consumer Warranty action; (2) are immoral, unethical, oppressive, unscrupulous

16   and substantially injurious to consumers and these factors are not offset by the utility of BP's

17   conduct since the conduct is intended to and does only provide impediments to the assertion of

18   valid claims for recovery and limit the damages which BP is legally obligated to compensate;

19   and (3) inflict substantial injury on consumers which is not outweighed by any countervailing

20   benefits to  consumers or competition and the injury to consumers is one consumers could

21   reasonably have avoided.

22       249.    Unless enjoined, BP's continued insistence upon the unenforceable Warranty

23   Exclusions and its further pursuit of the Claim Suppression Strategy threaten to harm the public in

24   the future.

25   / / /

26   / / /

27   / / /

28   / / /

# NINTH CLAIM FOR RELIEF

## (Violation of the Texas Deceptive Trade Practices Act)

### (By Plaintiffs and the Class against BP)

250.    Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

251.    Defendants violated the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41, et seq., when it represented, through advertising and other express representations that the Solar Panels had benefits or characteristics that they did not actually have and were of a certain standard or quality, when they were not. These representations and warranties, and the methods by which they were disseminated are detailed at Paragraphs 40, 52, 53 and 55 through 71. The reasons they are false are stated in Paragraph 54. BP also omitted to disclose the facts it was required to disclose, as more fully stated in stated in Paragraphs 25 through 39 (duty to disclose addressed in Paragraph 38).

252.    Defendant BP violated the state consumer protection laws enumerated below by including in the Warranty the unconscionable Warranty Exclusions. The Warranty Exclusions and the reasons they are unconscionable are described in Paragraphs 44 through 51.

253.    Had Plaintiffs and members of the Class known that the representations and warranties made by BP concerning the Solar Panels were false or had they been aware of the facts BP was obligated to disclose, Plaintiffs and members of the Class would not have purchased the Solar Panels or purchased properties on which the Solar Panels were installed. Plaintiffs and members of the Class would not have made these purchases because: (1) if distributors, sellers and installers had known of the falsity of BP's representations and warranties, or had BP disclosed the facts it was obligated to disclose, they would have recommended against the  purchase of the Solar Panels; and (2) irrespective of such recommendations, if Plaintiffs and the Class had been aware of the falsity of BP's representations and warranties or become aware of the facts BP was obligated to disclose, they would not have purchased the Solar Panels or properties on which the Solar Panels were installed.

254.    The facts supporting the allegations in the preceding Paragraph are detailed more fully herein, including Paragraphs 55 through 71 (particularly Paragraphs 70 and 71) (distributors, sellers and installers), 86 through 92 (Allagas), 107 through 110 (Ray) and 123 through 124 (Mohrman).

255.    Defendants intended that Plaintiffs and Class Members rely on their materially deceptive practices and purchase Solar Panels as a consequence of the deceptive practices, including Defendants' misrepresentations and omissions of material fact in their marketing of Solar Panels.

256.    As a result of Defendant BP's unfair and deceptive acts and practices, Plaintiffs and members of the Class have been harmed and seek actual damages according to proof, attorneys' fees and costs and such other relief as the court deems proper.

### TENTH CLAIM FOR RELIEF

### (Violation of the State Consumer Protection Laws)

### (By Plaintiffs and the Class against BP)

257.    Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

258.    Defendant violated the state consumer protection laws enumerated below when it represented, through advertising and other express representations that the Solar Panels had benefits or characteristics that they did not actually have and were of a certain standard or quality, when they were not. These representations and warranties, and the methods by which they were disseminated are detailed at Paragraphs 40, 52, 53 and 55 through 71. The reasons they are false are stated in Paragraph 54. BP also omitted to disclose the facts it was required to disclose, as more fully stated in stated in Paragraphs 25 through 39 (duty to disclose addressed in Paragraph 38).

259.    Defendant BP violated the state consumer protection laws enumerated below by including in the Warranty the unconscionable Warranty Exclusions. The Warranty Exclusions and the reasons they are unconscionable are described in Paragraphs 44 through 51.

48

260.    Had Plaintiffs and members of the Class known that the representations and warranties made by BP concerning the Solar Panels were false or had they been aware of the facts BP was obligated to disclose, Plaintiffs and members of the Class would not have purchased the Solar Panels or purchased properties on which the Solar Panels were installed. Plaintiffs and members of the Class would not have made these purchases because: (1) if distributors, sellers and installers had known of the falsity of BP's representations and warranties, or had BP disclosed the facts it was obligated to disclose, they would have recommended against the purchase of the Solar Panels; and (2) irrespective of such recommendations, if Plaintiffs and the Class had been aware of the falsity of BP's representations and warranties or become aware of the facts BP was obligated to disclose, they would not have purchased the Solar Panels or properties on which the Solar Panels were installed.

261.    The facts supporting the allegations in the preceding Paragraph are detailed more fully herein, including Paragraphs 55 through 71 (particularly Paragraphs 70 and 71) (distributors, sellers and installers), 86 through 92 (Allagas), 107 through 110 (Ray) and 123 through 124 (Mohrman).

262.    Defendants intended that Plaintiffs and Class Members rely on their materially deceptive practices and purchase Solar Panels as a consequence of the deceptive practices, including Defendants' misrepresentations and omissions of material fact in their marketing of Solar Panels.

263.    As a result of Defendant BP's unfair and deceptive acts and practices, Plaintiffs and members of the Class have been harmed and seek actual damages according to proof, attorneys' fees and costs and such other relief as the court deems proper.

264.    Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes, as set forth below.

a.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. Code § 40.50.471, et seq.;

49

b.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, et seq.;

c.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code §§ 4-88-101, et seq., including § 4-88-113(f), and § 4-8-102(5);

d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq. and the Consumer Legal Remedies Act ("CLRA") § 1750, et seq. and §§ 1770(e) and (g) of the Civ. Code;

e.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, et seq., including § 6-1-113(1)(c) and § 61-102(b);

f.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, et seq., including § 42-110(a)(3);

g.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, et seq., including 6 Del. Code § 2512;

h.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, et seq., including § 28-390(1);

i.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, et seq.;

j.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, et seq., including § 481A 2;

k.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, et seq., including § 48-602;

l.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, et seq. (Illinois);

1        m.    Defendants have engaged in unfair competition or unfair or deceptive acts

2    or practices in violation of Ind. Code Ann. § 24-5-0.5.1, et seq.;

3        n.    Defendants have engaged in unfair compction or unfair or deceptive acts

4    or practices in violation of Kan. Stat. § 50-623, et seq.;

5        o.    Defendants have engaged in unfair competition or unfair or deceptive acts

6    or practices in violation of Ky. Rev. Stat. § 367.110, et seq.;

7        p.    Defendants have engaged in unfair competition or unfair or deceptive acts

8    or practices in violation of 5 Me. Rev. Stat. § 207, et seq.;

9        q.    Defendants have engaged in unfair competition or unfair or deceptive acts

10   or practices in violation of Md. Com. Law Code § 13-101, et seq., including § 13-101(h);

11       r.    Defendants have engaged in unfair competition or unfair or deceptive acts

12   or practices in violation of Mass. Gen. L. Ch. 93A, et seq.;

13       s.    Defendants have engaged in unfair competition or unfair or deceptive acts

14   or practices in violation of Mich. Stat. § 445.901, et seq., including § 445.902(c);

15       t.    Defendants have engaged in unfair competition or unfair or deceptive acts

16   or practices in violation of Minn. Stat. § 325F.67, et seq., including §§ 325F.69 and 8.31 Subd.

17   3a;

18       u.    Defendants have engaged in unfair competition or unfair or deceptive acts

19   or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, et seq.;

20       v.    Defendants have engaged in unfair competition or unfair or deceptive acts

21   or practices in violation of Mont. Code § 30-14-101, et seq., including § 30-14-102(5);

22       w.    Defendants have engaged in unfair competition or unfair or deceptive acts

23   or practices in violation of Neb. Rev. Stat. § 59-1601, et seq., including § 59-1602;

24       x.    Defendants have engaged in unfair competition or unfair or deceptive acts

25   or practices in violation of Nev. Rev. Stat. § 598.0903, et seq.;

26       y.    Defendants have engaged in unfair competition or unfair or deceptive acts

27   or practices in violation of N.H. Rev. Stat. § 358-A:1, et seq., including § 358-A:1(1);

28

1        z.     Defendants have engaged in unfair competition or unfair or deceptive acts

2   or practices in violation of N.J. Stat. Ann. § 56:8-1, et seq., § 56:8-1(d);

3        aa.     Defendants have engaged in unfair competition or unfair or deceptive acts

4   or practices in violation of N.M. Stat. Ann. § 57-12-1, et seq.;

5        bb.     Defendants have engaged in unfair competition or unfair or deceptive acts

6   or practices in violation of N.Y. Gen. Bus. Law § 349, et seq.;

7        cc.     Defendants have engaged in unfair competition or unfair or deceptive acts

8   or practices in violation of N.C. Gen. Stat. § 75-1.1, et seq.;

9        dd.     Defendants have engaged in unfair competition or unfair or deceptive acts

10   or practices in violation of N.D. Cent. Code § 51-15-01, et seq., including § 51-15-01(4);

11        ee.     Defendants have engaged in unfair competition or unfair or deceptive acts

12   or practices in violation of Ohio Rev. Stat. § 1345.01, et seq.;

13        ff.     Defendants have engaged in unfair competition or unfair or deceptive acts

14   or practices or made representations in violation of Okla. Stat. tit. 15 § 751, et seq.;

15        gg.     Defendants have engaged in unfair competition or unfair or deceptive acts

16   or practices in violation of Or. Rev. Stat. § 646.605, et seq., including § 646.605(4);

17        hh.     Defendants have engaged in unfair competition or unfair or deceptive acts

18   or practices in violation of 73 Pa. Stat. § 201-1, et seq., including § 201-2(2);

19        ii.     Defendants have engaged in unfair competition or unfair or deceptive acts

20   or practices in violation of R.I. Gen. Laws. § 6-13.1-1, et seq., including § 6-13.1(3);

21        jj.     Defendants have engaged in unfair competition or unfair or deceptive acts

22   or practices in violation of S.C. Code Laws § 39-5-10, et seq., including § 39-5-10(9);

23        kk.     Defendants have engaged in unfair competition or unfair or deceptive acts

24   or practices in violation of S.D. Code Laws § 37-24-1, et seq., including § 37-24-1(8);

25        ll.     Defendants have engaged in unfair competition or unfair or deceptive acts

26   or practices in violation of Tenn. Code § 47-18-101, et seq., including § 47-18-103(9);

27        mm.     Defendants have engaged in unfair competition or unfair or deceptive acts

28   or practices in violation of Tex. Bus. & Com. Code § 17.41, et seq.;

1       nn.     Defendants have engaged in unfair competition or unfair or deceptive acts

2    or practices in violation of Utah Code Ann. § 13-1 1-1, et seq.;

3       oo.     Defendants have engaged in unfair competition or unfair or deceptive acts

4    or practices in violation of Vt. Stat. Ann. tit. 9, § 245.1, et seq.;

5       pp.     Defendants have engaged in unfair competition or unfair or deceptive acts

6    or practices in violation of Va. Code § 59.1-196, et seq., including § 59.1-198;

7       qq.     Defendants have engaged in unfair competition or unfair, deceptive acts

8    or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, et seq., including §

9    19.86.010(1);

10      rr.     Defendants have engaged in unfair competition or unfair or deceptive acts

11   or practices in violation of W. Va. Code § 46A-6-101, et seq.;

12      ss.     Defendants have engaged in unfair competition or unfair or deceptive acts

13   or practices in violation of Wis. Stat. § 100.20, et seq.; and

14      tt.     Defendants have engaged in unfair competition or unfair or deceptive acts

15   or practices in violation of Wyo. Stat. § 40-12-100, et seq., including § 40-12-102(a)(i).

16                     **ELEVENTH CLAIM FOR RELIEF**

17                       **(Misrepresentation/Omission)**

18                  **(By Plaintiffs and the Class against BP)**

19       265.    Plaintiffs hereby incorporate by reference the allegations contained in

20   the preceding paragraphs of this Complaint.

21       266.    Defendants knew or should have known that the Solar Panels were defectively

22   designed as alleged in further detail above.

23       267.    Defendants fraudulently, negligently, or recklessly concealed from and/or failed to

24   disclose to Plaintiffs and the Class the defective nature of the Solar Panels.

25       268.    Defendants were under a duty to Plaintiffs and the Class to disclose the defective

26   nature of Solar Panels because (i) Defendants were in a superior position to know the true state of

27   the facts about the defect and the defect is latent; (ii) Defendants made partial disclosures about the

28

quality of the Solar Panels without revealing their true defective nature; and (iii) Defendants actively concealed the defective nature of Solar Panels from Plaintiffs and the Class.

269.     The facts concealed and/or not disclosed by Defendants to Plaintiffs and the Class are material facts in that a reasonable person would have considered those facts to be important in deciding whether or not to purchase Solar Panels. Had Plaintiffs and the Class known the defective nature of the Solar Panels, they would not have purchased them or would have paid less for them.

270.     Defendants intentionally, recklessly, or negligently concealed and/or failed to disclose the defective nature of Solar Panels for the purpose of inducing Plaintiffs and the Class to act thereon, and Plaintiffs and the Class justifiably relied to their detriment upon the truth and completeness of Defendants' representations about the Solar Panels. This is evidenced by Plaintiffs' and Class members' purchase of the Solar Panels. As a direct and proximate cause of Defendants' misconduct, Plaintiffs and the Class have suffered actual damages, and are entitled to compensatory damages, attorneys' fees, costs, and interest thereon

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, prays the Court to certify the Class as defined hereinabove, to enter judgment against Defendants and in favor of the Class, and to award the following relief:

1.     For Certification of the proposed Class;

2.     For compensatory damages as alleged herein, according to proof;

3.     For restitution and/or disgorgement of revenues, earnings, profits, compensation, and benefits which were received by Defendants as a result of unlawful business acts or practices, according to proof;

4.     For an injunction enjoining BP from enforcing, threatening to enforce or claiming the right to enforce any of the Warranty Exclusions and from further pursuit of the Claims Suppression Strategy, including a requirement that: (1) BP advise consumers affirmatively of their rights to all damages to which they are lawfully entitled; (2) BP make full disclosure to all members of the Class concerning the risk of fire or electrocution resulting from the failure of the

1    Solar Panels and advise members of the Class how they can determine if their Solar Panels have

2    failed;

3           5.       For exemplary and punitive damages according to proof;

4           6.       For costs and attorneys' fees, as allowed by law; and

5           7.       For such other further legal or equitable relief as this Court may deem appropriate

6    under the circumstances.

7                                    **<u>DEMAND FOR JURY TRIAL</u>**

8           Plaintiffs demand a jury trial on all issues so triable.

9    DATED:  November 22, 2019              BIRKA-WHITE LAW OFFICES

10                                          By:  /s/ David M. Birka-White

11                                          David M. Birka-White (CA 85721)
                                            dbw@birka-white.com
12                                          BIRKA-WHITE LAW OFFICES
                                            178 E. Prospect Avenue
13                                          Danville, CA 94526
                                            Telephone: (925) 362-9999
14                                          Facsimile: (925) 362-9970
                                            *Attorneys for Plaintiffs*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONDITIONAL FOURTH AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTION
US 166917141v2

# EXHIBIT A

EXHIBIT A

**Design Drawings**

| Document No. | Drawing No. |
|---|---|
| BPS_000226709 | D15045 |
| BPS_000226611 | D15920 |
| BPS_000226614 | D15937 |
| BPS_000226627 | D16328 |
| BPS_000226625 | D16327 |
| BPS_000226620 | D16323 |
| BPS_000226617 | D16322 |
| BPS_000226630 | D17072 |
| BPS_000226633 | D17115 |
| BPS_000226603 | D17124 |
| BPS_000226601 | D17123 |
| BPS_000226691 | D17172 |
| BPS_000226636 | D17173 |
| BPS_000226607 | D17277 |
| BPS_000226605 | D17276 |
| BPS_000226641 | D17289 |
| BPS_000226651 | D17316 |
| BPS_000226647 | D17315 |
| BPS_000226645 | D17313 |
| BPS_000226654 | D17344 |

**<u>Solar Panel Model Numbers</u>**

BP170B
BP170I
BP175B
BP175I
BP365TS (manufactured 2005 to 2007)
BP375S
BP380L
BP380S
BP480S
BP485L
BP585DB
BP2140S
BP2150S
BP3115S
BP3123XR
BP3125S
BP3140S
BP3150B
BP3150L
BP3150S
BP3155S
BP3160B
BP3160L
BP3160QS
BP3160S
BP3165S
BP3170S
BP3195Q
BP4150S
BP4160S

BP4170B
BP4170S
BP4175B
BP4175I
BP4175S
BP5165S
BP5170S
BP7190S
BPSX150S
BPSX3150S
BPSX3160S
MSX120
SX5M
SX10M
SX20M
SX30M
SX40M
SX50M
SX60D
SX110S
SX120S
SX140B
SX140S
SX150B
SX150S
SX160B
SX160S
SX170B
SX3195B
SX4175S

Exhibit A — page 2